## Colwell *against* Woods.

L. executed and delivered to W. a deed in fee simple, for a lot of ground in consideration of a certain sum of money; and at the same time W. executed and delivered to L. a covenant, that he would reconvey the same to him upon the payment of the same amount of money within one year.   Held, that these papers constitute a mortgage, and are to be so construed, although it appear by parol that the parties did not so intend it.

ERROR to the district court of *Alleghany* county.

This was an action of ejectment by Stephen Colwell against James Woods, Lewis Peterson and Peter Peterson, to recover a lot of ground in the city of Pittsburgh.   It was admitted that the title had been in Robert Lindell.   The plaintiff gave in evidence a judgment against Lindell, a *fieri facias* issued thereon, levied on the lot in controversy, a *venditioni exponas* and sale of it, and conveyance by the sheriff on the 4th of March 1833 to James Colwell, who conveyed to the plaintiff.   The plaintiff also gave in evidence this notice, which was given at the time of the sale by the sheriff.

"Evans *v.* Lindell.   This property is sold subject to an incumbrance on the property held by James Woods, for 9500 dollars, with interest thereon from the 7th of July 1831, or whatever is due thereon.

"S. Colwell."

Indorsed—"The sheriff will please to retain the within in his possession.

"T. B. Dallas, September 6, 1832."

The plaintiff also gave in evidence a deed of the 5th of February 1831, Robert Lindell and wife to James Woods, conveying the lot in controversy, in fee simple, in consideration of the sum of 9500 dollars, and the following covenant of James Woods which was acknowledged at the same time.

"Whereas, Robert Lindell of the city of Pittsburgh, and Nancy his wife, have, by deed dated this day, conveyed to me in fee simple, two certain contiguous lots of ground, in the city of Pittsburgh, marked on colonel Woods's plan thereof, No. 270 and 271, bounded by Third, Second and Ferry streets, and by lot No. 272, for and in con-

[Colwell v. Woods.]

sideration of a sum of 9500 dollars, as in and by said deed will more
fully and at large appear. Now therefore be it known, that I James
Woods, of said city, for and in consideration of divers good causes and
considerations, me thereunto moving, and in consideration of the sum
of one dollar to me in hand paid at the time of signing this instru-
ment, the receipt whereof I do hereby acknowledge, have agreed,
covenanted and promised, and by these presents do agree, covenant
and promise, to reconvey to said Robert Lindell the aforesaid de-
scribed two lots of ground, at any time within one year from the
date hereof :

"Provided, the said Robert Lindell should within said year, fully
satisfy, pay, discharge and reimburse to said James Woods, the full
amount of the said purchase money to wit: 9500 dollars, together with
all interest which may have accrued thereon from this date ; and
shall further pay and satisfy all costs and charges of whatever kind,
which have been paid, laid out or expended by said James Woods,
in consequence of the purchase by him of said property ; and if the
said Robert Lindell, his heirs, executors or administrators, should not
within the period above specified, to wit one year, fully pay to said
James Woods the full amount of the purchase money as aforesaid,
together with the interest thereon, and also all costs and charges as
aforesaid, then this indenture of writing to be totally void and of no
effect ; any thing herein before contained to the contrary in anywise
notwithstanding, and also to be and remain in full force and effect.
Witness my hand and seal this 7th day of February 1831.

"JAMES WOODS, [L. S.]."

Robert Lindell was sworn as a witness and testified as follows:

" I was owner of the lots in dispute. At first I wanted Mr Woods
to assist me and take a mortgage on the property. There was then
a mortgage to Bonnet and others, of which some of the payments
became due, and they began to push for them. I wanted Mr Woods
to take a similar mortgage and pay the other claims. He objected
to taking a mortgage, and said he must have a deed. He observed
he did not want to contend with any of the creditors. He wanted
the thing so that he would have no trouble with it. Mr Woods,
himself, procured a list of liens against the property : after he did so,
I executed the deed. The claims did not amount to quite that money.
He got them with interest counted up to that date. I was released
from any interest after that date. It was considered as cash to be
paid by him at his leisure. The deed was executed for 9500 dol-
lars. At the same time a bond was given for a reconveyance in
twelve months afterwards, if the money was refunded with interest.
Some money was paid at the execution of the deed. I think up-
wards of 300 dollars were paid to me, which was an overplus above
the liens for other purposes. I had other debts to pay.. The redemp-
tion bond I had recorded. Mr Woods had it drawn and given to me.
I left the property, April was a year, after that.

" There were some indirect offers of something like 12,000 dollars

for the property.   Mr Peebles's bid was something like 12,000 dollars.   I told captain Woods the offers I had.   He observed that if they wanted the property they ought to bid a fair price for it.   This was a short time before the year was up.   I wanted Woods to extend the redemption bond.   He rather refused doing it—said he did not like to do it.   He did not say what course he would take, only that he did not want any advantage of me whatever.   I considered the 12,000 dollars as an advance of about 2000 dollars, as his claim would be about 10,000 dollars.   Nothing more was said about my ability to make a better sale, only that he did not want to take any advantage of me.   I had the same bid along in the summer.   It was late then, near the time the redemption bond was running out.   Allen Kramer had in the summer offered this—Mr Peebles something like 10,000 or 11,500 dollars—don't know that this was told Woods.   Woods only said, 'let them offer something like value for the property.'   I always considered him a friend.   Mr Woods received a portion of the rents after the redemption bond was up.   I think 575 dollars of rents.   He collected them himself.   I received some little for the outbuildings—something like 50 or 60 dollars.   In 1833 he had it altogether—took tenants himself.   The ground exclusive of what the church is on, is worth 600 dollars or upward rent per year.   The purchasing committee of the church had been speaking to me about it.   He, Woods, had been speaking to me about it—thought he would make a pretty advantageous sale of it.

"Was doing nothing in 1831, only winding up old business : I had some debts out from which I expected to realize something to pay my debts ; but they did not come to much.   The debts to Fullerton and Mason were part for book accounts and part for indorsements.   I owed them at the time of this agreement with Mr Woods.   At the time I made this deed to Woods, I valued the property at 15,000 dollars as the lowest price—would not have sold for that, only from the situation I was then in.   I have paid Fullerton's judgment.   The buildings on the lots cost me something like 7000 dollars.   They were all on the part in dispute.

" I dont think I had received any other offer at the time I entered into the contract with Woods.   The way I understood it was, that my title would cease if the money was not paid at the time.   Mr Woods refused to give it in any other way.   I considered it an actual sale—that was my view at the time.   I should not have given it, but that I expected to have a better price within the year.   I would have let it go to the hammer first.   Woods refused to take it in the way of mortgage.   He did not want to contend with creditors.   He did not want to be in law, nor did mean to be.   I tried different ways before I tried Woods—to the banks and others—could not get money on a mortgage.   I had offered the property for 15,000 dollars.   I never employed any attorney in the matter.   I did not know whether I had any right or not.   If I had, I was ignorant of it.   Nothing said at the time about its being a loan of money, at the time we closed

the contract. I wanted to raise 10,000 dollars on it—offered to mortgage. it to the banks for that—I cannot positively recollect what Peebles said. His offer was through Way. All I recollect was 12,000 dollars from Peebles, in cash, he could make *sich* and *sich* arrangements with the creditors, by paying interest. This was in February 1832, before the redemption bond was dead. There was a proviso in the offers, ' if he could make arrangements with the creditors.'

" None of the creditors that Woods was to pay, ever gave me a discharge. I considered Woods stood in my shoes, and I looked no farther after them. There was another suit by Bonnet for a debt not embraced in the mortgage. Woods became paymaster for the mortgage and that debt too. I was pressed by Bonnet at the time. Bonnet was importunate for his money."

Frederick Lorenze, sworn.—"I was one of the building committee of the third Presbyterian church—was one of the committee who purchased this lot: we purchased eighty-five or ninety feet on Third street, by near one hundred feet on Ferry street. We purchased sometime previous to the 1st of April last for 9500 dollars.

"March 25th, 1833. Article of agreement. James Woods with committee of church, for part of lots 270, 271 and 98 on Ferry street; 85 on Third street—consideration 9250 dollars, with interest from date. 2000 dollars April 1, 1833; 1000 dollars April 1, 1834; 2000 dollars April 1, 1835; 1000 dollars April 1, 1836; 1000 dollars in 1837; 1000 dollars in 1838; 1250 dollars in 1839, with interest on the whole from date.

" The only improvements on the part we purchased were some old sheds. If they had remained there, they might have been worth 100 dollars, but when removed, worth nothing more than old boards. In 1831 I heard of Mr Woods and Lindell's arrangement. After Woods had got the property, I heard Lindell say that Woods was going to advance 9000 dollars. He told me if he could pay Woods that money before the expiration of the lien, the property would be his: that he had done it for the purpose of gaining some time, that he might see about getting a good price for it. I don't recollect whether I made him directly an offer, or indirectly through Mr Peebles—don't recollect the amount, whether 10,500 or 11,500 dollars. Mr Peebles said perhaps we could go 500 dollars more. I think I had no conversation with Mr Woods about the price I offered, or any thing said in his presence. Mr Lindell appeared to have a great deal of confidence in Mr Woods that he would do what was right. Certainly I would have given the sum offered, if it had been accepted. Peebles and Way both observed that Bonnet's bonds would be waited for a couple of years. He would take 2000 dollars next April, and 2000 dollars a year after. Peebles observed, if I would give a certain price Bonnet would do it. Peebles went to Lindell and came back displeased—said Lindell behaved queer; he did know what was the matter—he would not interfere about it. When we purchased the church lot

[Colwell v. Woods.]

from Woods, he mentioned Colwell's claim. I said that Colwell would not interfere as to that part. The lot the church is on, is at a pretty high price. The warehouse and dwellinghouse, our calculation was, that 6000 dollars for that in 1831; I mean this was my calculation in 1831. I think property rose a little in 1832 on account of the opening of the street. The balance of the property left from the church, by the way the other sold, ought to be worth 8000 dollars in the spring of 1833."

Robert Peebles, sworn.—"I am acquainted with the property in dispute; when I first heard of Lindell's distress, I took an interest in endeavouring to sell his property for him. I had heard that Allen Kramer had offered 11,000 or 11,500 dollars, I dont know which. I went to Allen Kramer, and tried to persuade him to buy. He said that he was scarcely able to buy, that he had not funds enough. I then proposed to him to go round to the creditors and see, to get time for the amounts due. Bonnet was the first I called on. He said 'Lindell has not treated me well, but on your account I will give him some time.' I think about as stated by Mr Lorenze. I then went to George Shiras—I disremember the time—he was willing to indulge one or two years. I am not so certain about calling on Irwin, but was induced to believe that could be arranged in a similar way. I then returned to Mr Kramer, offered to go into bank for him for 3000 dollars. I then went to Lindell, told him he had better take the 12,000 dollars, that I was induced to believe that I could get Allen to give him that price. In order to get him to come down to what was a fair price, I took Mr Hay and Darlington to persuade him of the propriety of taking the sum that could then be obtained for it. This was before the sale was made to Woods. After Mr Hay and Darlington had talked the matter over, Lindell partly consented to take the 12,000 dollars. I then went back to Kramer—he could have the property for 12,000 dollars. In the mean time James Gray had come across him, and made him an offer of some other property. Then the bargain appeared to be at an end. This was in the winter before the sale to Woods. I considered the property worth 12,000 dollars. Sometime afterwards I met Lindell. He told me he had made a sale to Woods—I asked him the terms—he said 9500 dollars. I asked why take such a price as that? He observed that Mr Woods was a friend, and had given him a year to get the money and sell the property. I felt satisfied, thinking Woods his friend. When the year was near out, I heard Mr Lorenze would like to have the property. I got Mr Way to speak to Mr Lorenze. Within a few days of the time expiring, I got uneasy about the poor man losing his property, and hearing Lorenze would give 11,000 or 11,500 dollars, I went to hunt Mr Lindell, when I found this price could be obtained. I met Woods—told me 'I did not want any advantage taken of Lindell'—that I could get a good price for the property—the money could be got. I dont recollect what passed—he said nothing one way or the other. I went to Lindell and found him;

[Colwell v. Woods.]

observed he.was very careless—the time was near up—that I could now get him a good price for his property. I thought he treated my opinion and services with indifference; he appeared as easy as if he did not care about it; told him he could now get a good price for his property—think I mentioned the amount offered. I considered it more valuable then than the year before, as there was a prospect of a street opening—I went back to Mr Way, said I supposed there was a private understanding between them, that Woods was to give him something more for the property to set him up in business again, as Woods was his friend. Lorenze appeared quite willing to purchase at 11,000 or 11,500 dollars. Lindell had repeatedly proposed to me to raise money for him by mortgage on the property. He thought he could get from the banks, but could not. Lindell was loath to take 12,000 dollars, he valued it at 15,000 dollars."

Bradford, Esq.—" On the 15th of June last, I went with Mr Colwell, the plaintiff, to the house of Mr Woods, the defendant. We there saw Mr Woods. Mr Colwell stated he had come to make him a tender of 3000 dollars; he stated, he supposed that would be about the amount due on his mortgage. Mr Woods replied he would not take it: that he had fairly bought the property and considered it as his own. I saw Mr Colwell take out his pocket book. I know there were 3000 dollars in it. Mr Woods said that if he would take the money at all, he would take the notes as well as specie. He did not require a tender in specie."

W. C. Enos, sworn for defendant.—" I am acquainted with Robert Lindell. In 1830 and 1831 I was engaged in doing business for Mr Lindell; he was considerably embarrassed; a large judgment against him in favour of Bonnet; had not the means, and concluded to sell his house and lot—he desired me to effect some negotiation with regard to the sale of the house and lot—I spoke to several persons. I spoke to Mr Kramer, also to Mr Hannah. They called on him and spoke concerning it—perhaps Mr Peebles—among the rest was captain Woods—Lindell had made out a plan of cutting up his lots; thought he could sell them better that way, but it fell through. I afterwards told him that Bonnet's execution was pressing—Lindell told me to go and see captain Woods; says he, I think captain Woods will make a purchase; I went to search for Woods, found him engaged at a steamboat. I told him now was about the crisis of Lindell's affairs, that I thought he had better make some arrangement to extricate him from his difficulties—Mr Lindell preferred, if captain Woods did purchase it, it should be so that he could have a certain time to redeem it in—and seeing captain Woods, I named this to him. Woods said he felt friendly to him and disposed to help him, but he could not think to let Lindell have his money to use it, for, says he,. I can do better with my money; that he could have ten or twelve per cent for his money; if he did any thing, he must do that which was conclusive; he did not want to have trouble. After dinner captain Woods came up; various propositions were made by Mr Lindell

III.—z

[Colwell v. Woods.]

—Lindell wanted a mortgage; captain Woods would not have any thing but an absolute deed; he wished to evade lawsuits and difficulties, but he would give him time to redeem it; Mr Dallas was mentioned to draw the writings. Lindell was to give an absolute deed, and Woods to sign an agreement to re-convey the lot to Lindell if he refunded the money in a year—in pursuance of that agreement, a deed was brought for Lindell and wife to sign; think Woods told me Mr Dallas drew it; Lindell signed it and wife; think I witnessed it—not sure—witnessed some contract about it at that time—captain Woods was to furnish means to discharge these debts; several debts were now enumerated which were to be paid, I can't recollect them all—Bonnet's, Montgomery's, Lorenze's, and others. I understood, and I think the parties understood, it was to be a final sale at the end of the year; Mr Woods said he would not have it on any other terms.

"There were debts pressing Lindell, which he designed paying off by this money from Mr Woods; I presume there was a statement of the amount of debts; don't recollect, as I had often made calculations of the amounts due."

T. B. Dallas, Esq.—"I was spoken to by captain Woods a day or two before the date, to draw a deed; said he had bought the property—wished me to examine the title—I procured from the prothonotary's and recorder's office, a list of the liens; the next day after the deed was drawn he told me—wished an agreement drawn by which he would stipulate if the debt and interest and expenses were repaid in a year, then he would reconvey the property—the deed and this agreement were handed to captain Woods—I thought no more of it, till Woods called on me, and I went with him when he paid off these judgments, &c. which were liens on the property—I thought no more of the property till Woods told me there was an execution out on the property—I met Mr Colwell on Market street, and asked him what the meaning of it was; asked him if he was aware the property had been conveyed prior to the date of the judgment—he smiled and said nothing, or if he replied I don't recollect—shortly before the deed was offered for acknowledgement, I asked him if he intended to press the claim under the title derived from the sheriff—whether he was serious in the matter. His reply was, You will see.

" Captain Woods came often to my office to know if Colwell intended pressing his claim—I said I would like to know from Lindell what really did pass, told him to tell Mr Lindell to come to my office and tell me what took place at the time. Mr Lindell and Enos, and captain Woods came to my office.

" Mr Enos made his statement pretty much as he did here. Mr Lindell stated that the facts were as Enos stated—I asked him to state to me whether he had in view a final sale accompanied with this condition; or whether he intended the paper to be a mortgage—He said, O no, Woods positively refused to take a mortgage—he told

[Colwell v. Woods.]

me he really had thought that within the year he had expected to get the money from his brother.

"Lindell was not at my office while the papers were preparing. Don't know whether Woods stated the money had been paid or was to be paid; he said Lindell urged him to make the purchase several times before he agreed to do it. I have not dealt much in real estate; in Pittsburgh never; I have bought, and observed sales; purchased in 1828."

James Thompson.—"I knew the property in 1831. I don't recollect of forming an opinion as to the value of them; often understood Woods had purchased them, and the terms; I said I thought he had paid as much worth—I had never examined the lots particularly, but that was my impression at the time—owned property two squares below that; formed my estimate of their value from my own; could not say what I would have given—had made no inquiry about the property—my impression was at that time he had paid the full value of them."

The plaintiff brought into court, on the trial, the amount he considered due to the defendant on his mortgage.

The plaintiff's counsel submitted three points on which they requested the charge of the court.

1. That the deed of conveyance and defeasance are to be regarded as one instrument, and are in equity a mortgage.

On this point the court said, "it is true as stated, that the deed and defeasance are to be regarded as one conveyance: but whether they are in equity a mortgage or not, depends upon the acts, declarations and situation of the parties showing their intentions, of which much parol testimony has been given, and must therefore be decided by the jury upon the principles of law already laid down to them. But if it be intended to ask the court for a construction of these instruments from the face of them alone, the court would say that they do not know how a scrivener could draw a deed for land with covenant to repurchase the same land at a fixed price and a specified time, intending to make it differ from a mortgage, if this be not such; they cannot therefore charge the jury as requested in the last clause of this point."

2. That if the jury believe the facts stated by the witnesses Lindell, Peebles, Lorenze, Enos and Dallas, the deeds of conveyance and defeasance are to be considered and treated as a mortgage, especially when taken in connection with the fact that Lindell remained in possession from the date of the conveyance to the 1st of April 1832; and received the rents and profits of the estate.

"To have stated the point correctly, the plaintiff's counsel should have stated hypothetically the facts on which they wished the court to pronounce the law; but the court will not decline answering it in its present form.

"It is true that the fact of Lindell remaining in possession, is a strong circumstance to show that a mortgage was intended, and not a sale.

: [Colwell v. Woods.]

Still it is but a circumstance; and although of great weight, it is not conclusive, and other testimony may account for it and entirely over-balance it, if the jury believe from it that the parties, nevertheless, did intend a sale, and not a loan and security for money. The court cannot, therefore, charge the jury as requested in this point; on the contrary if they believe the witnesses mentioned, it is not a mortgage and should not be treated as such."

3. The declarations of Woods to Lindell prolonged the period of redemption, and waived his advantage under the conveyance.

"This is a fact for the jury; if they can find any evidence that justifies them in believing that Woods prolonged the time of redemption, or hindered him from selling, by holding out false hopes of lenity, for the purpose of inducing him to let the time of redemption or repurchase pass by, they should find for the plaintiff. But the court will not say, as requested, that there are any declarations of Woods to Lindell that should have that effect."

The jury found a verdict for the defendants.

*Forward* and *Fetterman*, for plaintiff in error.
*Dallas* and *Biddle*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—Several errors have been assigned in this case; but it appears to me that the only point in which the district court erred, that this court can review and correct, is in the charge to the jury; in which his honour the judge advised them that the deed of conveyance made by Lindell to Woods, and the bond given at the same time by Woods to Lindell, conditioned for a reconveyance of the property upon Lindell's reimbursing the purchase money with interest thereon, beside costs and charges which had been paid by Woods in consequence of the purchase, were upon their face *per se* a conditional sale, and not a mortgage.

The deed of conveyance and the bond, as was very properly stated by the judge in the court below, are to be considered as only one instrument; for they are constituent parts of the execution of the same agreement, executed both at the same time as appears by a declaration to this effect contained in the bond. They also appear to have been both acknowledged at the same time before the same officer, and to have been recorded within twenty days afterwards. If the bond, or deed of defeasance as it may be called, instead of having been put into the form of a distinct and separate instrument from the deed of conveyance, had been introduced into the latter in the form of a clause of defeasance, as is usually done in drawing mortgages, I apprehend that no one would have hesitated a moment to pronounce it a mortgage. Indeed it seems to me, from the whole current of authorities on this subject, it could not have been considered otherwise either in law or equity. The conveyance and the bond then being deemed but constituent parts of one and the same

[Colwell v. Woods.]

instrument, must be regarded precisely in the same point of view and of the same effect as if they had been joined together in the same writing, and had formed but one deed. The sum inserted in the conveyance as the consideration is 9500 dollars; and it is expressly provided by the bond, that upon the repayment of this sum by Lindell within one year thereafter, together with the interest thereon and the charges incurred by Woods in consequence of the purchase, that the latter should reconvey the property to the former. The purchase money being to be repaid *with interest* tends rather to show that it was a *loan* in reality. And as it was to be repaid *with interest* in the course of a year, it goes to show that it was not the understanding of the parties that Woods should take possession of the property under the conveyance during that time, because it would have been inequitable as well as usurious in him to have received both the rents of the property and the interest on the money. And this still tends further to show that the money advanced was a *loan*, and that the conveyance and bond taken together were to be a security for the repayment of it; that is, to be considered a mortgage and not a conditional purchase. And again, from the circumstance that Woods was not to take the possession of the property until after the year had elapsed, it may reasonably be inferred that in the estimation of both parties it was worth more than the money advanced upon it, by at least the amount of the interest thereon for the year; which likewise goes to show that the transaction was in reality founded on a *loan* of money and not upon a sum paid for the property, which was considered and agreed on by both parties at the time to be a *fair* and *full price* for it. And I am inclined to believe that it is the advancement of what at the time was considered by both parties a *fair* price for the property, when it consists of *real* estate, taken also in connection with their intention, that must give to the transaction the character of a conditional purchase or a defeasible purchase subject to a repurchase, instead of a mortgage. Mellors *v.* Lees, 2 *Atk.* 495; Wharf *v.* Howell, 5 *Binn.* 503; Stoever *v.* Stoever, 9 *Serg. & Rawle* 447. I consider the case of Manlove *v.* Bale and Bruton, 2 *Vern.* 84, very like the present, only more strongly indicative perhaps of an intention in the parties to make it a conditional sale. Bruton having a church lease for three lives in 1664, *conveyed* it to the father of Bale in consideration of 550 pounds; the conveyance was *absolute*: but Bale the *purchaser*, by writing under his hand and seal agreed that if Bruton the *vendor* should, at the end of one year then next ensuing, pay him 600 pounds, he would reconvey. The 600 pounds were not paid. Two of the lives died, and the lease was renewed twice by the defendant Bale and his father. It was held to be a mortgage: and twenty years after the first conveyance, Manlove, to whom Bruton had assigned the equity of redemption in satisfaction of a debt, was adjudged entitled to redeem; and accordingly a decree of redemption was passed in his favour, on his paying the 550 pounds with interest, together with the

fines paid in order to procure renewals of the loan; and Bale at the same time to account for the profits from the death of his father, but anterior to that they were to be set off against the interest.

Judgment reversed, and a *venire de novo* awarded.