# Spering's Appeal.

1. Where a party having a personal knowledge of a transaction states in his answer the main fact positively, a circumstance of the transaction is sufficiently stated according to his remembrance and belief.

2. Where the transaction is a loan of money on security of property, it is taken to be a mortgage without regard to the form of the transaction, and the actual intention that it should operate otherwise cannot prevail.

3. This rule is intended for the protection of a needy debtor against a merciless creditor, and does not prevail where the transaction is not a loan but a sale at a fair price.

4. A transaction between brokers as to stocks construed a sale and not a mortgage.

January 12th 1869. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the decree at Nisi Prius: No. 2, to July Term 1867.

On the 12th of April 1867 Joshua Spering, assignee of the National Safety Insurance and Trust Company, filed a bill in equity against T. A. Drexel, Anthony J. Drexel and others, trading as Drexel & Co., and Stephen Coulter.

The bill set out:—2. That as assignee aforesaid he ascertained that prior to April 29th 1869 there had come into the hands of the defendants of the assets of the company certificates Nos. 7915 and 7916 for 661 and 550 shares respectively of the preferred stock of the Schuylkill Navigation Company; certificate No. 3507 for

100 shares of the Little Schuylkill Navigation Company; certificates Nos. 128 and 129 for 10 and 48 shares respectively of the stock of the Commonwealth Bank of Philadelphia; that these certificates had been transferred to Drexel & Co. on several dates between the 3d of January and the 19th of March 1861. 3. That these securities were assets of the company, and passed to the plaintiff as assignee; that they had been deposited with Drexel & Co. by Coulter as security for an usurious loan; that Coulter obtained custody of these securities unlawfully by collusion with certain officers of the company, and that he acted under a pretended agency for the company; Drexel & Co. knew that the company was prohibited by law from entering into such transactions; plaintiff believed Drexel & Co. had notice that the securities did not belong to Coulter, but belonged to the company, which was then notoriously insolvent, and they were therefore affected by Coulter's fraud. 4. The plaintiff was appointed assignee May 18th 1861, and did not know the foregoing facts until 1862, when he received from Coulter the copy of a paper in the hands of Drexel & Co. (A.), and an original paper (B.), charging that as the papers are dated a few days after the assignment, and when the stay law in relation to the sale of collaterals was in force, the design was by suppressing B. to turn A. into an absolute sale. 5. Drexel & Co. at the same time had 803 shares of the preferred stock of the Schuylkill Navigation Company, in addition to the above, deposited by Coulter in the same manner. Coulter admitting them to belong to the company, gave the plaintiff an order (C.). The plaintiff, without knowing the complicity of Drexel & Co. with Coulter, offered to pay them the respective sums of $16,592 and $9000, and demanded the collaterals. Drexel & Co. stated an account (D.), and on payment by the plaintiff of the balance appearing on it, gave him the certificates for the 803 shares, but declined to give him the securities first mentioned, "alleging, according to the best of the plaintiff's recollection, that they had parted with them, or had not got them." 6. The plaintiff has since learned that the securities demanded were then in the possession of Drexel & Co., or under their control, but they refused to deliver them under a pretence of title founded on papers A. and B., and because the securities were worth more than the loan and interest. The plaintiff averred that independently of fraud, Drexel & Co. could not, without a judicial decree or a public sale after notice to Coulter or his assigns, have acquired title to the securities; the plaintiff averred such notice to Drexel of Coulter's fraud as would compel Drexel & Co. to deliver him the securities without repayment of the loans to Coulter, and to repay the balance ignorantly paid by plaintiff on obtaining the 803 shares. 7. The plaintiff averred, as a reason for his delay in proceeding, that he obtained knowledge of the fraud and ille-

[Spering's Appeal.]

gality of the transaction only within a few months. 9. The plaintiff offered to repay the loan on the delivery of the securities, if he was bound to do so, as the court should direct. The relief prayed for was that Drexel & Co. should deliver the securities, that an account of dividends, &c., received by him, and the sum paid by the plaintiff on the delivery of the 803 shares, should be decreed.

The exhibits referred to in the bill are as follows :—

"A.

"Know all men by these presents, that I, Stephen Coulter, for and in consideration of the sum of $16,428, this day paid to me by Drexel & Co., have granted, bargained and sold, and do hereby grant, bargain and sell to Drexel & Co., the following shares of capital stock in the following companies, viz. :

"550 shares of pref'd stock Sch. Nav. Co. as per certf. 7916
"661   "      "    "   "   "   "    "    " . 7915
"100 shares capital stock Little Sch. Nav. R. R. and Coal Co. as per certf. No. 3507.
"48 shares capital stock of the Commonwealth Bank of Phila., as per certf. No. 129.
"10 shares capital stock of the Commonwealth Bank of Phila., as per certf. No. 128.
"All of which are now held by Drexel & Co., and in their name, as collateral security for the said sum of $16,428, and the above sale is made in consideration of and in payment and satisfaction of said debt.

"Witness my hand and seal this 29th day of April 1861.

"STEPHEN COULTER. [SEAL.]

"B.

"We hereby agree to sell to Stephen Coulter, at any time he may demand their delivery, within sixty days, twelve hundred and eleven shares preferred stock of the Schuylkill Navigation Company; one hundred shares of the capital stock of the Little Schuylkill Navigation Railroad and Coal Company, and fifty-eight shares of the capital stock of the Commonwealth Bank of Philadelphia, for the price or sum of sixteen thousand five hundred and ninety-two dollars cash, to be paid to us by said Coulter at the time said stock is delivered to him. But this agreement is not to extend beyond sixty days from this date.

"Witness our hands this 29th day of April 1861.

"DREXEL & Co."

"C.

"1211 shares Sch. Nav. pref'd.
  100 Little Sch.
   10 Common'h. Bk., full paid.
   48   "        "$30 pd. on the above, borrowed $16,592.

[Spering's Appeal.]

This loan was made up of $16,000 principal, $592 interest. The loan was extended giving right of redemption for 60 days.

803 shares Sch. Nav. preferred loan $9000.

Certif. of Sch. Nav. Bond.

Messrs. Drexel & Co.

Gent.—Please settle with J. Spering, Esq., for the above loans, and upon payment of amount due by me, hand over to him the securities.          Yours truly,

May 7th '62.          STEPHEN COULTER."

D. was an account commenced July 8th 1861 and ending May 10th 1862, charging a note of $9000 interest, &c., crediting dividends and interest, and showing a balance of $9319.29 due to Drexel & Co.

Drexel & Co., in their answer, averred that the statements made to excuse the delay in commencing proceedings were untrue; that by accepting the account D. and the other transactions, he ratified the sale of April 29th 1861, and that there was nothing to invalidate the effect of the account; they averred that papers A. and B. state the precise and whole truth of their transaction with Coulter, who had been a broker in good credit, they having had frequent transactions with them; the transactions had all been conducted in his name; they did not know nor had they any reason to believe that he was acting on behalf of the Trust Company, the collaterals were in the usual form, with powers of attorney to transfer in blank; they believed Coulter to be the owner and so dealt with him; the operation was one of the most common in their daily business as banker; they did not deal with Coulter as a broker of an undisclosed principal, but individually on his own credit and that of his collaterals. The securities at the time of the execution of paper A. and for nearly a year afterwards, would not have brought the prices at which they agreed to take them; they were taken in extinguishment of the debt, and they had no claim on Coulter afterwards. The indebtedness of Coulter, except the $9000 which was a single independent loan, arose from numerous short or call loans, varying from $6000 to $25,000, and at the settlement amounted to $16,248. The order from Coulter left in their possession related only to the $9000 loan, as appears by the copy to the answer attached (marked Exhibit B.) They did not admit or recollect that C., annexed to plaintiff's bill, was presented, or that demand was made for the other securities, but averred they did not decline to deliver on the grounds alleged in the bill, " that they had parted with them or had not got them." The plaintiff gave the receipt (C.) annexed to the answer for the securities then delivered. They averred that nothing was then done to mislead or deceive the plaintiff, or to affect the binding effect of the agree-

[Spering's Appeal.]

ment.   They sold the securities at the times and for the amounts
in the account (A.) annexed to the answer, without notice from
the plaintiff of his claim or that he was assignee of the company.
The exhibits annexed to the answer are as follows :—

### A.

" April. 29th 1861.  
   1211 Schuylkill New Pref'd,  
     100 Little Schuylkill,     } $16,428.00  
      58 Commonwealth Bank.

" SALES.

" 1862

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| May  8, 250 | Schuylkill Pref'd, | 12 | . | . | . | $3002.50 |
| "   13, 500 | "          " | $15\frac{5}{8}$ | . | . | . | 7812.50 |
| "   16, 150 | "          " | 12 | . | . | . | 1803.90 |
| June 20, 100 | "          " | 12 | . | . | . | 1209.60 |
| July  2,  11 | "          " | 12 | . | . | . | 178.75 |
| "   "  200 | S 60 | | . | . | . | 2424.00 |
| May 20, 100 | Little Schuylkill | | . | . | . | 1912.50 |
| Aug. 27,   58 | Commonwealth | | . | . | . | 1914.00 |

                                                  $20,257.75"

### B.

" 803 Shares Schuylkill Nav. Pref'd.  
  Loan  of  Certificate  of  Schuylkill  } $9000.00  
    Nav. Bond.

" Messrs. Drexel & Co.

" Gentlemen : Please settle with J. Spering, Esq., for the above
loans, and upon payment of amount due by me, hand over to him
the securities.                     Yours truly,  
                                      " STEPHEN COULTER.'

### C.

" Received May 10th 1862, of Drexel & Co., 803 shares of
Schuylkill Nav. Pref'd.; also $2409 of Schuylkill Nav. Loan,
1876, delivered to me in settlement of S. Coulter's loan of $9000.  
                                 " JOSHUA SPERING,  
                               " $142\frac{1}{2}$ South Fourth."

Coulter in his answer admitted that he received the securities
from the company and pledged them to Drexel & Co.  He averred
that the finance committee of the company was authorized to
hypothecate or sell the securities of the company ; they had put a
large amount in his hands as collateral for loans made by him to
the company or negotiated for them ; he was authorized to pledge
or sell them, and gave the money raised on them to the company.
His directions were that it should not be known for whom he was

acting. Drexel & Co. had no notice from him that the securities were not his own. He had had extensive operations before that time with Drexel & Co., both individually and as broker for others, in which the company was not interested. At the settlement of April 29th 1861 he understood he was making an absolute sale in discharge of his indebtedness; that it was not an intention to turn the pledge into a mortgage. Exhibits A. and B., annexed to the bill, were given to plaintiff before the sixty days had expired; the price at which the securities were sold to Drexel & Co. was more than they would then have brought in the market; neither he nor the assignee could within the sixty days make anything by buying them back, and they let them go; there was no collusion; the arrangement was the best he could devise for the settlement of an honest debt for money borrowed and received by the company. He stated to the plaintiff, shortly after plaintiff's appointment as assignee, his connection with the company, and plaintiff expressed himself satisfied with the settlement. According to his recollection he did not sign the order of May 7th 1862 in the shape in which it is annexed to the *bill.*

A general replication was filed, and an examiner appointed.

The plaintiff, who was examined, testified, amongst other things: —"I presented that paper (C. to bill) entire to Mr. Anthony Drexel. It was then entire; I told him I was prepared to take up those loans, and pay him what was due upon them. I asked to do so, and to have the stocks. I learned from Mr. Drexel that all the stocks, except the 803 shares of Schuylkill Navigation Preferred, which were collateral with the loan of $9000, were, as I understood it, sold, and the other transaction for $16,000 closed."

    *     *     *     *     *     *

"In regard to the other stocks which were collateral with the loan of $16,000, I came away with the impression that they had been sold and closed out, and that the loan was barely paid by them. * * I have already said that I came away with that impression. I could only have derived it from Mr. Drexel, and I am certain that I was not told that any of the stocks were on hand. * * I had no knowledge in reference to the condition or position of the stocks, except what I derived from Mr. Drexel at that interview, and I came away with the impression that they were sold. I saw Mr. Anthony Drexel. I had the interview with him. I explained to him that I claimed them as assignee of the National Insurance Company."

In answer to the question—

"What reasons did Mr. Drexel give for not delivering the collaterals for the loan of $16,000 to you?"

He said:—

"That that transaction was settled, and in evidence of that he showed me the two papers marked Nos. 1 and 2. I do not say

that Mr. Drexel told me distinctly that the stocks had been sold by them, but he did not tell me that they were unsold or still on hand, and I came away with the impression that they were sold. I gave him distinctly to understand that I was prepared to redeem them, and he distinctly declined." &ast; &ast; &ast;

In answer to a question on cross-examination he said:—

"You perceive that I have used the word impression, and that while I do not say Mr. Drexel told me that the stock was sold by them, I say distinctly that he did not tell me they were not sold, for that would have put me on the *qui vive* to get them back, and I came away with the impression that they had been sold by Drexels. * * I went away satisfied that the matter was closed, and that the stocks were sold, otherwise I should have gone further, and should not have rested there. * * Mr. Drexel used no more words than the transaction required. The impression on my mind was that he was reticent, and said just as little as possible."

Coulter was examined, and testified the stock was collateral for that single sum of $16,000, and not for a running loan that was increased and diminished from time to time; that his debt was extinguished by the sale of the stocks to the defendants. His testimony in other respects was substantially as the statements in his answer.

A. J. Drexel was examined for defendants, and testified that he did not recollect telling the plaintiff that the stocks had been sold by the defendants; they had not then sold them, and could not have so told plaintiff. He might have told him that Coulter had sold the stocks to the defendants. The evidence taken from Coulter for the debt was the defendant's ordinary stock-note, which is in the following form:

$                          " Philadelphia,                    18

"promise to pay to Drexel & Co.

or order                                                    dollars

without defalcation for value received, with interest from date hereof, at the rate of        per cent. per annum, having deposited with them as collateral security

and hereby authorize them to sell the same at the Brokers' Board, or at public or private sale, or otherwise, at their option, on the non-performance of this promise, without notice; and authorize them to use, transfer, or hypothecate the same, at their option, they being required, on payment or tender of the amount loaned and interest at any time before said stock shall have been sold, to return an equal quantity of said stock and not the specified stock deposited."

C. J. Thompson, at Nisi Prius, dismissed the bill, delivering the following opinion:—

[Spering's Appeal.]

" I do not feel called on to give a review of the law presented on argument of the case. Suffice it that I am clearly of opinion from the answers and proof that the paper of the 24th of April 1861 was a bonâ fide sale of the securities thereon mentioned for a valid consideration, namely, the indebtedness of Coulter to the firm of Drexel & Co., at which time the evidence of the indebtedness was given up to him, without any notice whatever to the firm of Drexel & Co., that he was not the bonâ fide owner in his own right of the stock. Nor do I regard the proposition of the Drexels to sell the same number of shares of stock to Coulter within sixty days at the same price which they paid for that stock as turning the sale of the stock in the bill of sale into a conditional sale of that stock to Drexels. It was not that stock which was agreed to be sold to Coulter within sixty days, but any shares to that extent. Had the stock advanced Coulter would doubtless have called upon them for it; as it was he never did call. All the testimony contradicts the idea that the transaction was a mortgage. There is not a shadow of evidence of any fraud or connivance on the part of the Messrs. Drexels in procuring the stock, or in their treatment of the plaintiff a year after their purchase of the stock, when called upon by him as assignee of the National Safety Insurance and Trust Company. They allowed a redemption of such stock as they held as collateral from Coulter, but disallowed the stock now in suit as having been fully settled for. It is not established by any means by Mr. Spering's testimony that he was told that it had been disposed of by the Drexels. His testimony amounts to no more than an impression that he was told so; while that of Mr. A. J. Drexel is very positive that he was not so told. Unless there was fraud in this particular on the part of the Drexels, there was no excuse for the plaintiff lying by for six years, nearly, without uttering a single note of warning, that the settlement concluded on the 10th of May 1862 was not final, and I find nothing like evidence of fraud in it. I see no ground for the relief prayed for, and therefore the bill of complaint is dismissed at the cost of the plaintiff."

The plaintiff appealed, and assigned for error, that the court erred in dismissing the bill of complaint, and in not granting the relief prayed for by the complainant.

*E. S. Miller* (with whom was *C. B. Penrose*), for appellant. If the parties intended an absolute sale of the stock, it still was a breach of trust by the directors and Coulter as agent: Koehler *v.* Black River Co., 2 Black 715. Ignorance of the agency would not protect the defendants unless they were purchasers for a valuable consideration. A pre-existing debt is not such consideration unless it appear that it is extinguished; the proof of which must be something more than the allegation of the instru-

ment which is retained by the creditor: Rosa v. Brotherton, 10 Wend. 86; Bank v. Worthington, 12 Wend 593; Payne v. Cutter, 13 Id. 605; Clark v. Ely, 2 Sand. Ch. 168; Stalker v. McDonald, 6 Hill 93; Dickson v. Tillinghurst, 4 Paige 215, &c., &c.; Wormley v. Lowrey, 1 Humph. 468; Van Wick v. Norvall, 2 Id. 192; Lenheim v. Wilmarding, 5 P. F. Smith 73; Garrard v. Railroad, 5 Casey 154; Conway v. Alexander, 7 Cranch 237.

There must be averment and proof that the evidence of indebtedness was surrendered: 1 Daniel Ch. Pr. 701, 718. A party testifying in his own favor must testify *positively*: Hall v. Wood, 1 Paige 404; Sloan v. Little, 3 Id. 103; Pierson v. Meaux, 3 A. K. Marsh. 6; Woods v. Morrell, 1 Johns. Ch. 103; Pitts v. Hooper, 16 Geo. 442; Kittledge v. Bank, 3 Story C. C. 590; Greesley's Eq. Ev. 24; Scott v. Hume, Litt. Sel. Cases 379; Taylor v. Luther, 2 Sum. 228. That the same stock was not to be sold to Coulter but other like shares, would not change the transaction: Wildman v. Wildman, 9 Ves. 174. An express exemption of vendor from all personal liability will not affect the right of redemption: Longuet v. Seawen, 1 Russ. & Mylne 506. In determining whether the transaction is a sale or mortgage, the courts of Pennsylvania give very little weight to forms: Heister v. Madeira, 3 W. & S. 384; Houser v. Lamont, 5 P. F. Smith 311; Kunkle v. Wolfersberger, 6 Watts 130; Wharf v. Howell, 5 Binn. 499; Colwell v. Woods, 3 Watts 188; Manlove v. Bale, 2 Vern. 84; Kerr v. Gilmore, 6 Watts 405; Brown v. Nickle, 6 Barr 390; Reitenbaugh v. Ludwick, 7 Casey 131; Wilson v. Shoenberger, Id. 299. Even in conditional sales a reconveyance is sometimes compelled after the expiration of the time: Robb v. Crossy, 2 Edw. 147; Betts v. Annis, 40 N. H. 34.

*S. Dickson* (with whom was *J. C. Bullitt*), for appellees.—Even if the transaction were fraudulent an assignee could not avoid it: Twelves v. Williams, 3 Whart. 485; Vandyke v. Christ, 7 W. & S. 373. But the transaction was ratified according to Coulter's testimony, which is evidence for Drexel & Co.: 2 Daniel's Ch. Pract. 982, note. Equity will not help a party guilty of laches: 2 Story's Eq. § 1520; Deloraine v. Browne, 3 Br. Ch. R. 640; Wagner v. Baird, 7 How. 258; Badger v. Badger, 2 Wallace 94; especially as to articles of fluctuating value: Prendergast v. Turton, 1 Younge & Coll. 98; s. c. 13 Law J. Ch. N. S. 263; Adams Eq. 227. A mortgagee of personalty may sell on notice without foreclosure: Tucker v. Wilson, 1 P. Wms. 261; Lockwood v. Ewer, 2 Atk. 303; Hart v. Ten Eyck, 2 Johns. Ch. 100; Story's Eq. Jur. § 1013. A party having a secret equity permitting the apparent owner to deal with it as if he were the real owner, cannot afterwards assert his title: Mangles v. Dixon, 1 Mac. & G. 446; s. c. 3 Clark, H. L. C. 740. Coulter says in his answer

that his debt was discharged. His answer being responsive is evidence for Drexel & Co.: Mills *v.* Gove, 20 Pick. 28; Fletcher *v.* Wier, 7 Dana 354; Wolley *v.* Brownhill, 13 Price 500; s. c. 1 McL. 317; 2 Dan. Ch. Pr. 982*, note. No stipulations when executing a mortgage can clog the equity of redemption: 4 Kent Com. 143; Adams' Eq. 311; Alderson *v.* White, 2 De G. & J. 97. The debt was paid when the paper was given, therefore it could not be a mortgage: Holmes *v.* Grant, 6 Paige 248; Robinson *v.* Cropsey, Id. 480; Goodman *v.* Grierson, 2 Ball & Beatty 274; 1 Powell on Mort. 126; Nixon *v.* Cotter, 1 Ridge 295; Hicks *v.* Cook, 4 Dow's P. C. 16; Gossip *v.* Wright, 9 Jurist, N. S. 592. The right of redemption being equitable the appeal is to the conscience of the chancellor: Lockwood *v.* Ewer, 2 Atk. 303; Burdick *v.* McVaunce, 2 Denio 170; Waterman *v.* Brown, 7 Casey 161; Mellish *v.* Robertson, 25 Verm. 603. This was a dealing between brokers in stocks, which are of most uncertain value: Bodine *v.* Glading, 9 Harris 54: Fonblanque's Eq. 48, note; Clegg *v.* Edmundson, 3 Jur. N. S. 297; 8 De G. M. & G. 787; Norway *v.* Rowe, 19 Ves. 144; Prendergast *v.* Turton, 1 Y. & C. 98; Ernest *v.* Vivian, 33 Law J., Ch. 513. The papers themselves are not the only criterion whether they are a mortgage, it is to be determined by the object and intent of the dealing: Todd *v.* Campbell, 8 Casey 250; De France *v.* De France, 10 Id. 385. The bill makes a case of actual fraud which is not established; it should not be allowed to be used for a secondary purpose: Glasscott *v.* Lang, 2 Phill. 810; Price *v.* Berrington, 7 Eng. L. & Eq. 251; Maguire *v.* O'Reilly, 3 Jones & Lat. 224; Fenaby *v.* Hobson, 2 Phill. 255; Wilde *v.* Gibson, 1 H. L. C. 605; Luff *v.* Lord, 11 Jur. N. S. 51; Eyre *v.* Petter, 15 How. 42, 56.

The opinion of the court was delivered, January 18th 1869, by
AGNEW, J.—What was the true character of the transaction of 29th April 1861? To determine this, let me state the facts admitted or clearly proved. Drexel & Co. had lent to Coulter $16,000 on a pledge of stocks as collateral security, with a power of sale to reimburse the loan. Both parties were stock-brokers and bankers familiar with affairs of this sort. When the transaction of the 29th April took place, the loan of $16,000 was due, and Drexel & Co. had the power to sell the pledge absolutely to pay the debt. They were bonâ fide holders of the security for a valuable consideration, to wit, the money lent. It is not pretended they had any notice of Coulter's agency, or of the saving-fund company's ownership. Nor can it be pretended that a sale by them of the stocks to repay the loan would not have passed title. It is equally clear that they could sell to themselves by the agreement of Coulter. Then what is paper A., the first of the two executed on the 29th April 1861? On its face it is a distinct,

[Spering's Appeal.]

clear and absolute sale by Coulter to Drexel & Co. of the stocks held in pledge in consideration of the payment of the debt of $16,000, and $428 interest added. The proof is, that the stocks were then barely worth the debt. Thus far the clearly-expressed intention of the parties contained in the paper coincides with their relations and the power of Drexel & Co. This brings us to the debated question of actual extinguishment of the debt.

It is argued by the plaintiff that the testimony of Coulter and A. J. Drexel fails to establish this fact, and that the proof of extinguishment must be more than the averment of the paper itself. But this averment is in the first place corroborated by the coincident relations of the parties at the time of the execution of the paper, the power of Drexel & Co. to produce this result, and the absence of motive on their part to produce any other. It is scarcely to be believed that a party holding a power to sell absolutely to pay an overdue and pressing debt, would extend the debt upon a mere mortgage of the same security without a power of sale. But the testimony of Coulter and Drexel supplements this, and proves the extinguishment. In answer to the question whether, on the 29th April 1861, he had sold the securities to Drexel & Co., Coulter replied, "Yes, sir, I understood that my debt at that time was extinguished, the loan was due and Drexel & Co. had the power of sale." Anthony J. Drexel says, "My recollection is, that the evidence of the debt taken by us was an ordinary stock-note, of which this is a copy (containing a very express power of sale). I presume the note was surrendered to Mr. Coulter at the settlement, April 29th 1861. We have not got it. We had pressed Mr. Coulter previous to that to pay the debt. He was unable to do so. We finally offered to take the stocks for the debt, to which he agreed. The stocks were unsaleable except at a great sacrifice; prices were nominal; we could not have got our money out of them by selling them on the market." These statements are explicit that the debt was satisfied by the transaction of the 29th April 1861. Two objections are made to this testimony. Coulter says that pledge was collateral for the single sum of $16,000, and not for a running loan increased or diminished from time to time. This, the plaintiff alleges, is contradictory to the answer of Drexel & Co., that the debt arose from numerous short or call-loans. But the next sentence of the answer proceeds to say, "and which at the time of settlement amounted to $16,248," indicating a settlement and single sum due before the 29th April 1861, for the sum had then arisen by accrued interest to $16,428. If it should be a transposition of figures by misprint, still the discrepancy between Coulter's testimony and the answer cannot prevail over the undoubted character of the transaction, as proved by all the testimony and the cor-

10 P. F. Smith—14

roborating nature of the circumstances.   The running loans were all reduced to a single sum on the 29th April 1861, if not before; and a confusion of dates in Coulter's memory is not surprising after the lapse of time before he was examined.   The second objection is to the form of Drexel's expression, when he says, "I presume the note was surrendered."   It is argued this falls within the rule requiring a party having a positive knowledge of a fact to state it positively, and not according to his mere remembrance and belief.   But the argument loses sight of the true character of Drexel's testimony.   He states the main fact of a settlement and extinguishment of the debt positively in these words, "We finally offered to take the stocks for the debt, to which he agreed," and this is expressly corroborated by Coulter himself.   The surrender of the note was but one circumstance of the transaction, and was a fair presumption in the mind of Drexel, who was testifying six or seven years after the transaction, arising from the main fact of payment which he well knew, and from the circumstance he also stated, to wit, that they had not the note.   If to this we add the usages of that business, and the familiarity of Drexel and Coulter with all such transactions, it becomes impossible to doubt that the evidence of debt was surrendered on the execution of paper A.   Upon the whole case we must conclude, therefore, that the parties actually intended, and did, by the transaction of April 29th 1861, make an absolute sale of the stocks in payment of the debt for which they had been held in security.

This brings us to consider the effect of paper B., of the same date, by which Drexel & Co. agreed to sell to Coulter at any time he might demand their delivery within sixty days and not beyond, the same number of shares and kinds of stock for the price of $16,592 cash on delivery.   It is argued upon the authority of Colwell *v.* Wood, 3 Watts 188, Kunkle *v.* Wolfersberger, 6 Id. 130, and kindred cases, that paper B. converts paper A. into a mortgage, against the actual and expressed intent of the parties. We do not think so.   The principle of all these cases is, that when the real transaction is a loan of money upon the security of property it is to be deemed a mortgage or pledge, and not a sale of the property without regard to the forms in which the parties choose to veil their transactions.   The true character of the transaction being that, then even the actual intention that it shall operate otherwise cannot prevail.   But I know of no rule of law or equity, if there be no loan of money on security, and the true character and intention of the transaction is to make an absolute sale, which frustrates the intention of the parties.   The rule which prevents the conversion of a security for a loan into a sale is intended for the protection of the needy debtor against the rapacity of a merciless creditor.   But this never can be the case where the transaction partakes not of the character of a loan, and the

sale is for a fair price.   How then is this case?   The transaction of 29th April 1861 was no loan, and no pledge on security.   The parties did not meet to negotiate a credit on one side and a security on the other, but the reverse; they met to adjust payment for an existing overdue debt, pressing for payment and armed with the means of enforcing it.   The loan had been made long before, and the property was then held in pledge.   Its nature was already that of a mortgage, and the subject of sale was the equity of redemption.   Drexel & Co. had the power of foreclosure, and did not need to extort anything from the necessities of Coulter as the consideration of a hard loan.   It was their right to convert the stocks by an absolute sale freed from the equity of redemption, and this they did by a sale to themselves, with the assent and agreement of their debtor.   On what principle, therefore, of law or equity should we interpret paper B. into a defeasance of paper A.?   There is none, and on the contrary there is every reason to adopt its own literal expression, to wit, an agreement to sell and deliver so many independent shares of stock within sixty days for a specified cash sum.   This accords with the proof and the form of the instrument.   The proof is undeniable that it followed an absolute sale, and was merely a concession of liberality to Coulter of the rise in the market within sixty days.   The form of the paper accords with the intent.   The stocks mentioned in paper A. are specific shares, by number of the certificate, as well as by number of shares.   Paper B. merely proposes to sell a given number of shares.   Paper A. transferred specific shares.   Paper B. promised independent shares.   Thus both form and proof strip paper B. of the character of a defeasance, and establish it as a mere promise to sell other stocks in conformity to the actual intent of paper A., as well as its language.   But it is said shares of stock are all alike, and an agreement to sell an equal number of like stocks is consistent with the idea of redemption, and therefore that this form should not prevent the operation of paper B. as a defeasance.   Certainly this would be so if it were a part of a transaction of loan and security.   In that case the intention to redeem could well be inferred as consistent with the instrument. But here we should not hold that to be a defeasance which is not so in form or in fact, but which only followed the adjustment and payment of a precedent debt, and was intended for a different purpose, to wit, to secure to Coulter the rise in the market for a specified time.   We can easily understand how a debtor, whose property is already pledged for his debt and liable to be sold, may agree to pass it over in payment, and yet obtain from his creditor a concession of any advance in price it will bring in a limited time.   Such, we think, was the true character of this transaction, and it follows that the decree at Nisi Prius must be affirmed, with costs.